## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**SHARONDA P.,** *on behalf of* **T.P.,**

    **Plaintiff,**

**v.**

**KILOLO KIJAKAZI,** *Acting Commissioner, Social Security Administration,*[1]

    **Defendant.**

**CIVIL ACTION FILE**

**NO. 1:20-cv-01581-AJB**

# O R D E R   A N D   O P I N I O N[2]

Plaintiff Sharonda P., on behalf of T.P. ("Plaintiff"),[3] brought this action pursuant to § 1631(c) of the Social Security Act, 42 U.S.C. § 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security

---

[1]    Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration. Under the Federal Rules of Civil Procedure, Kijakazi "is automatically substituted as a party." Fed. R. Civ. P. 25(d). The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entry dated Jan. 4, 2021). Therefore, this Order constitutes a final Order of the Court.

[3]    T.P. is a child under the age of 18. [Record (hereinafter "R") 36].

Administration ("the Commissioner") denying his application for supplemental security income benefits ("SSI").[4]  For the reasons set forth below, the Court **AFFIRMS** the final decision of the Commissioner.

## I.   <u>PROCEDURAL HISTORY</u>

Plaintiff filed an application for SSI benefits on behalf of claimant T.P. on August 16, 2016, alleging disability commencing on July 27, 2016.  [R202].  Plaintiff's applications were denied initially and on reconsideration.  [R118-25; 130-139].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R153-54].  An evidentiary hearing was held on March 7, 2019.  [R59].  The ALJ issued a decision on June 3, 2019, denying Plaintiff's application on the

---

[4]      Title II of the Social Security Act provides for federal Disability Insurance Benefits ("DIB").  42 U.S.C. § 401 et seq.  Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq., provides for SSI benefits for the disabled.  Unlike DIB claims, SSI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).  Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Thus, in general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim.  *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).  Therefore, to the extent that the Court cites to DIB cases, statutes, or regulations, they are equally applicable to Plaintiff's SSI claims.

ground that T.P. had not been under a "disability" at any time through the date of the decision.  [R53].  Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on February 12, 2020, making the ALJ's decision the final decision of the Commissioner.  [R1-9].  In her appeal to the Appeals Council, Plaintiff submitted additional evidence, including a neurodevelopmental evaluation of T.P. dated July 25, 2019, through August 1, 2019.[5]  [R2, 10-26].  The Appeals Council declined to consider this evidence on the ground that it did not relate to the period at issue, since the ALJ's disability determination was through the date of his decision on June 3, 2019.  [R2].

Plaintiff then filed an action in this Court on April 13, 2020, seeking review of the Commissioner's decision.  [Doc. 1].  The answer and transcript were filed on December 4, 2020.  [Docs. 23, 24].  On April 19, 2021, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 35], and on May 19, 2021, the Commissioner filed a response in support of the decision, [Doc. 37].  Plaintiff also filed a reply brief on June 2, 2021, and a notice of supplemental authority on June 15, 2021.  [Doc. 39].  The parties did not request

---

[5]     As relevant, the summary portion of the neurodevelopmental evaluation notes that T.P.'s "parents and treatment providers sought an evaluation to determine [T.P.'s] current level of functioning."  [R20].

oral argument. [*See* Dkt]. The matter is now before the Court upon the administrative record, the parties' pleadings, the parties' briefs, and the parties' oral arguments, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   STANDARD FOR DETERMINING DISABILITY

"An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *accord* 20 C.F.R. § 416.906. The individual who seeks Social Security disability benefits must prove that he or she is disabled. 42 U.S.C. § 1382c(a)(3)(H)(i) (rendering the provisions from 42 U.S.C. § 423(d)(5) applicable to SSI disability applications, which places burden on claimant to prove disability); *see* 20 C.F.R. § 416.912(a) ("In general, you have to prove to us that you are blind or disabled.").

"Federal regulations set forth the process by which the [Social Security Administration] determines if a child is disabled and thereby eligible for disability benefits." *Shinn ex rel. Shinn v. Comm'r*, 391 F.3d 1276, 1278-79 (11th Cir. 2004). "The Commissioner uses a three-step analysis to make this determination."

4

*Turberville ex rel. Rowell v. Astrue*, 316 Fed. Appx. 891, 892 (11th Cir. Feb. 18, 2009).   Under the regulations, this process begins at step one with the Commissioner determining whether the child is "doing substantial gainful activity." 20 C.F.R. § 416.924(a).  If the child is performing substantial gainful activity, the child is considered "not disabled" and is ineligible for benefits.   20 C.F.R. § 416.924(b).

If the child is not engaged in substantial gainful activity, the Commissioner next considers at step two whether the child's "physical or mental impairment(s)" alone or in combination with other impairments are severe.  20 C.F.R. § 416.924(a), (c).  An impairment will be considered in a disability application only if it arises from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).  Statements of nonmedical sources, such as "parents and other caregivers," teachers, and other school personnel may be used to determine the effects of the child's impairments on his or her functioning. 20 C.F.R. § 416.924a(a)(2).  If the impairments are found not to be severe, the child is considered "not disabled" and is ineligible for benefits.  20 C.F.R. § 416.924(c).

If the child has a severe impairment or impairments, the Commissioner next assesses at step three whether the impairment or combination of impairments

5

"causes marked and severe functional limitations" for the child. 20 C.F.R. §§ 416.911(b), 416.924(d).   Limitations arising from pain and other symptoms count in this determination.   20 C.F.R. § 416.924(a) ("[The ALJ] will also evaluate any limitations in your functioning that result from your symptoms, including pain."); *see also* 20 C.F.R. § 416.924a(b)(2) ("[Y]our symptoms (such as pain, fatigue, decreased energy, or anxiety) may limit your functioning.").

The Commissioner uses objective criteria listed in the Code of Federal Regulations ("C.F.R.") to determine whether the impairment causes severe and marked limitations.  *Shinn ex rel. Shinn*, 391 F.3d at 1278.  "The C.F.R. contains a Listing of Impairments ["the Listings," found at 20 C.F.R. § 404 app.] specifying almost every sort of medical problem ("impairment") from which a person can suffer, sorted into general categories."  *Id*.  "For each impairment, the Listings discuss various limitations on a person's abilities that impairment may impose. Limitations appearing in these listings are considered 'marked and severe.'"  *Id.* (quoting 20 C.F.R. § 416.925(a)).

A child's impairment or combination of impairments will cause "marked and severe functional limitations" at step three if the impairment or combination of impairments "meet[s], medically equal[s], or functionally equal[s] the [L]istings." 20 C.F.R. § 416.911(b)(1); *see also* §§ 416.902(h), 416.924(a).  The impairment

6

"meets" a Listing if the child satisfies the criteria specified in the Listings for that child's severe impairment. 20 C.F.R. § 416.925(c)(3). The impairment "medically equals" a Listing if the child's impairment "is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a).

Finally, if the limitations resulting from a child's particular impairment are not comparable to those specified in the Listings, the Commissioner examines whether the impairment is "functionally equivalent" to those in the Listings. 20 C.F.R. § 416.926a(a); *Shinn ex rel. Shinn*, 391 F.3d at 1279. To make this determination, the Commissioner examines the degree to which the child's limitations interfere with the child's normal life activities. *Shinn, id*. The regulations specify six major domains of life:

> (i) Acquiring and using information;
>
> (ii) Attending and completing tasks;
>
> (iii) Interacting and relating with others;
>
> (iv) Moving about and manipulating objects;
>
> (v) Caring for [one]self; and
>
> (vi) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). The regulations also contain various "benchmarks" that children should have achieved by certain ages in each of these life domains.

*See* 20 C.F.R. §§ 416.926a(g)-(l).  A child's impairment is "of listing-level severity," and thus "functionally equals the listings," if as a result of the limitations stemming from that impairment the child has "'marked' limitations in two of the domains [of the six major domains of life listed above], or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d).

If the limitations stemming from a child's severe impairment meet, medically equal, or functionally equal the limitations specified in the Listings, the ALJ then examines whether the impairment "meets the duration requirement." 20 C.F.R. § 416.924(a).  An impairment meets this duration requirement if it "[is] expected to cause death or . . . has lasted or can be expected to last for a continuous period of not less than 12 months."   20 C.F.R. § 416.906; *accord* 20 C.F.R. § 416.909.

## III.   <u>SCOPE OF JUDICIAL REVIEW</u>

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.   Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478,

8

488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is

substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## IV.   STATEMENT OF FACTS[6]

### A.   Hearing Testimony

At a hearing before the ALJ on March 7, 2019, T.P. was present with Plaintiff, who is his mother, and his grandmother, but did not testify himself. [R59-61]. Plaintiff testified that T.P. had been diagnosed with autism spectrum disorder, had developmental problems, repeated things a lot and could not focus, had been diagnosed with attention deficit hyperactivity disorder ("ADHD"), and did not make eye contact. [R69]. She stated that T.P. had a hard time in large crowds and did better in small groups. [R69]. Plaintiff testified that T.P. had "slight asthma" that was managed with a nebulizer. [R69]. She stated that she began to notice his

_____

[6]   In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 35, 37-39; *see also* Doc. 25 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")]. Where a party's numbering conflicts with the page numbers assigned by the Court's electronic filing system, the Court's citations will utilize the page numbering assigned by the Court's electronic filing system.

issues when he was around age one because he was very aggressive and started walking late.  [R69].  Plaintiff testified that she noticed he was very hyper and did not listen around age two, and his speech was very "babyish."  [R69-70].  She stated that T.P. had been kicked out of approximately five daycares due to his aggression and lack of obedience.  [R70].

Plaintiff additionally testified that T.P. saw a psychiatrist at the Marcus Autism Center ("TMAC") about once a month and that he was in therapy once a week to help his behavior.  [R70-71].  She stated that he was also in speech therapy but that she had to stop taking him because of transportation issues.   [R71]. Plaintiff testified that, as far as treatment, T.P. took "medication that his psychiatrist prescribed, but that's really just it."  [R72].  She stated that T.P.'s medications were mostly for his ADHD, to help keep him calm and focused in school.   [R73]. Plaintiff testified that she believed the medication helped "sometimes a little bit" depending on the day, explaining that T.P. would act out and get aggressive if he was overstimulated, but that sometimes the medication helped him focus just long enough for his teachers to teach him.  [R75].  She stated that his medication had been changed around ten times due to side effects.  [R75].

Plaintiff testified that T.P. attended school and was in the first grade, and that he had three teachers.  [R76].  She stated that he had an Individualized Education

Plan[7] ("IEP") and that he was taught in a self-contained classroom that was smaller and had the capability to restrain T.P. if needed.  [R77].  Plaintiff testified that T.P. had certain classes where he was taught with other students and certain classes where he was taught one on one.  [R77].  She stated that "[a]cademic-wise, he's very smart."  [R78-79].  Plaintiff testified that even in the self-contained classroom, however, T.P. struggled with aggression, which he sometimes expressed by throwing objects and hitting or punching other students.  [R79].  She stated that sometimes they were able to calm him down right away and other times it took a while to get him calm.  [R80].

Plaintiff additionally testified that T.P. had to be removed from class two to three times a week due to his behavior and had been suspended from school once for fighting.  [R80].  When he was removed from class, he was either taken to another teacher's class or sent to the special needs representative, "Mr. B."  [R81].  Plaintiff stated that T.P. was generally able to complete his work while at school and rarely had homework.  [R81-82].  Plaintiff testified that T.P. participated in

---

[7]     An IEP is a plan developed to ensure that a disabled child receives specialized instruction and related services.  The process is more involved than that of a § 504 plan, and documentation of measurable growth is required.  *What is the Difference between an IEP and a 504 Plan?*,  DO-IT, https://www.washington.edu/doit/what-difference-between-iep-and-504-plan (last visited Mar. 12, 2022).

extracurricular activities, including football, baseball, and karate. [R82-83]. She stated that he did okay socially during those activities but that the other kids often avoided him due to his aggression. [R83].

Next, Plaintiff testified that T.P. lived at home with her, his grandmother, and his three sisters. [R85]. She stated that he was aggressive with his sisters at times, especially his older sister. [R85-86]. Plaintiff testified that he did not have tantrums at home as often as at school, but that when he did, he would scream, throw things, cry, or hit his sisters. [R86-87]. She stated that the tantrums could last up to 30 minutes and happened two to three times per week at home. [R87-88]. Plaintiff testified that T.P. would often hold his ears and flap his hands. [R88].

Plaintiff also testified that T.P. was able to feed and dress himself but that he needed help with dressing most days and could not fasten buttons or tie his own shoes. [R90]. She stated that he could clean up his room but that she had to constantly repeat herself to get him to do it. [R91-92]. Plaintiff testified that, in T.P.'s free time, he would play outside, watch TV, and run around the house. [R92]. She stated that he also enjoyed watching his sister play video games. [R92]. Plaintiff testified that he could pay attention to these activities for about ten minutes before he moved on to something else. [R93]. She stated that, with regard to T.P.'s

13

speech, he did not pick up his tongue when he spoke which resulted in him sounding "like a one and two-year old trying to talk."  [R95].

Plaintiff then testified that Dr. Helen Panarites, T.P.'s psychiatrist at TMAC, was the doctor who knew T.P. best.  [R95].  She stated that Dr. Panarites had been treating T.P. for almost two years.  [R95].  Plaintiff testified that she hoped to get T.P. seen by an occupational therapist to help him work on his coordination and the use of his hands.  [R96].  She also stated that she had to take medical leave from her job due to T.P.'s issues and that she had been fired from a previous job for taking so much time off from work to assist him.  [R97-98].

T.P.'s grandmother testified that T.P. was very aggressive and did not have any social skills.  [R99-100].  She stated that he was very impatient with his siblings and did not know how to make friends, so he isolated himself.  [R100].  She testified that she had a hard time understanding a lot of T.P.'s speech and that she had to redirect him over and over again to get him to do things.  [R100].  She reiterated that he did not give any eye contact and stated that he was not affectionate.  [R100]. She testified that T.P. got along well with her and his mother but that he only really talked to her if he wanted something.  [R100-01].  She recounted an incident where he threw his sister's tablet across the room, and another incident where he punched his older sister in the eye.  [R101].  She testified that he took his medication as

14

prescribed with assistance from his mother.  [R102-03].  She stated that his medication helped sometimes but that it sometimes made him more aggressive, and that he had problems with constantly putting things in his mouth.  [R103].  She testified that she would like to place T.P. in a private school for children with disabilities but that they had not been able to afford it.  [R105].

### B.   Record Evidence

#### 1.   School Records

In December 2015, as a preschooler, T.P. was found eligible for special education services and an IEP.  [R231-238].  The report completed at that time noted that T.P. exhibited inappropriate behavior in class such as hitting, spitting, screaming, and biting, which did not improve with intervention.  [R232]. According to information provided by Plaintiff, T.P. demonstrated affection, could feed himself and was toilet trained, spoke in short sentences, could name some colors, and knew his age.  [R233].  The report noted that T.P.'s academic skills scored in the average range and that "no negative educational impact [was] expected."  [R233].  T.P. had articulation difficulties, and his intelligibility was poor, but other areas of communication appeared to be normal.  [R234]. Additionally, T.P. did not exhibit a significant developmental delay in social skills based on two testing measures.  [R235].  T.P. was being considered for special

education eligibility on the basis of a speech or language impairment.  [R237].

As a result, an IEP was implemented in December 2015, which explained that T.P.'s communication issues required specialized instruction to learn new skills and participate in the typically developing peer group.  [R385].  T.P. was to receive specialized instruction with regard to communication.  [R385].  Under his IEP, he was to be given consultative and supportive services in the classroom and was to be placed in a separate class.  [R388].  T.P. was to also receive an hour of speech therapy per week.  [R389].

In March 2016, T.P.'s eligibility for special education services was re-evaluated.  [R390].  The report noted that T.P. was being treated for "behavioral concerns" and that he had been prescribed Risperdal.[8]  [R390].  In January 2016, T.P. had been expelled from preschool for the third time for behaving aggressively towards his peers.  [R392].  Further, while T.P. initiated social contact with familiar adults, he responded differently to familiar versus unfamiliar children, and did not engage well with peers across environments.  [R394].  T.P. tended to be aggressive, including kicking, spitting, and biting.  [R394].  As to sensory abilities, T.P.

---

[8]    Risperdal is a brand name for risperidone, which is a medication used to treat behavior problems such as aggression, self-injury, and sudden mood changes in children with autism.  Risperidone, *Medline Plus,* https://medlineplus.gov/druginfo/meds/a694015.html (last visited Mar. 12, 2022).

established eye contact when comfortable and maintained improved attention and the ability to remain on task in small group environments where an adult was physically close in proximity. [R395]. T.P. still exhibited poor articulation but had a well-developed vocabulary and could produce five-to-seven word sentences. [R395]. T.P. was considered eligible for special education services on the basis of a significant developmental delay in addition to impaired speech. [R397].

In March 2016, T.P.'s IEP was amended accordingly. [R239-266]. The IEP indicated that T.P. had behavior that impeded his learning or the learning of others. [R245]. The IEP also indicated that T.P. needed audio and visual aids, small group instruction, and positive reinforcement in the classroom. [R246]. The IEP further indicated that T.P. was to receive 14 hours per week of "specially designed instruction in a small group setting and 1 hour per week of speech therapy." [R249]. T.P. attended a different school than he was districted to in order to receive these services. [R249]. In December 2017, T.P. was re-evaluated and his IEP was continued. [R664-672]. During that evaluation, T.P. had at least passing grades in all subjects and a normal general development score. [R665]. T.P. was reported to become easily upset while completing school work despite being capable of doing the assignments and had been observed hitting and kicking classmates and teachers and destroying school property. [R666].

In December 2018, Tonya Garner, a special education paraprofessional, completed a teacher questionnaire regarding T.P. [R466]. She stated that she had observed T.P. every day for the preceding four months and that T.P. was in the first grade, conducted reading, math, and written language on a first-grade level, and was in a self-contained classroom with a 6 to 1 student to teacher ratio. [R467]. As to the functional domains, Ms. Garner opined that T.P. had: a slight to obvious problem with acquiring and using information; a slight to very serious problem with attending and completing tasks; a slight to very serious problem with interacting and relating with others; no problems with moving about and manipulating objects; and none to a serious problem with caring for himself. [R468-473]. As to interacting and relating with others, Ms. Garner noted that T.P. had to be removed from class or restrained at times to help him calm down but that he was "a lot calmer" and quieter when on his medication. [R470, 473]. She also noted that she could understand no more than half of his speech when the topic was unknown but could understand almost all after repetition or rephrasing. [R471].

John Bastarache, the school behavioral specialist, also completed a teacher questionnaire in December 2018. [R483]. Mr. Bastarache stated that he had known T.P. for two years and saw him two to three times per week. [R476]. As to the functional domains, Mr. Bastarache opined that T.P. had: a slight to obvious

problem with acquiring and using information; a slight to serious problem with attending and completing tasks; a slight to very serious problem with interacting and relating with others; none to an obvious problem with moving about and manipulating objects; and none to a very serious problem with caring for himself. [R477-481].   Mr. Bastarache noted that T.P.'s "anger and aggression are heightened when [T.P.] is not on medication" and that T.P.'s functioning greatly improved while on medication while he was "unsafe and aggressive when not medicated."  [R479, 482].  Mr. Bastarache also noted that he could understand no more than half of T.P.'s speech when the topic was unknown but could understand almost all of it when the topic was known or after repetition and rephrasing.  [R480].

Regina Manuel, daycare center director, also completed a teacher questionnaire in June 2017.  [R359].  She stated that she had known T.P. for just over a year and observed him for approximately four hours per day during the school year and all day during the summer.  [R350].  Ms. Manuel stated that T.P. had: an obvious to very serious problem with attending and completing tasks; an obvious to serious problem with interacting and relating with others; no problems with moving about and manipulating objects; and none to a very serious problem caring for himself.  [R351-55].  Ms. Manuel stated that she understood very little of T.P.'s speech.  [R354].

19

2. *Medical and Psychological Records*

In January 2016, T.P. was seen by Dr. Olufemi Taiwo at Southern Behavioral Healthcare. [R741]. Plaintiff reported that T.P. was doing poorly, out of control, and unstable. [R741]. Plaintiff also reported that T.P. was compliant with his medication but that it did not help his behavior, and Plaintiff requested a medication change. [R741]. Dr. Taiwo noted that T.P.'s medical history included autism spectrum disorder and intermittent explosive disorder and prescribed Risperdal. [R742]. In February 2016, T.P. visited Dr. Taiwo again, with Plaintiff reporting that his behavior improved with his medication adjustment but that there was no improvement with his attention and concentration, irritability, or speech. [R738-40]. At an April 2016 visit with Dr. Taiwo, Plaintiff again reported that T.P.'s medication was "effective in improving his behavioral problems and academic difficulties." [R735]. Plaintiff also reported that T.P.'s attention span, concentration, and focus had "much improved," along with his self-control skills. [R735]. He was continued on Risperdal. [R737].

In July 2016, T.P. underwent a psychological evaluation at TMAC. [R678]. It was noted that he had been expelled from two daycares due to his aggression. [R679]. T.P. was observed to have variable social interaction, fleeting attention, and could follow one-step instructions, but needed motivation to continue the

20

assessment at times.  [R680-82].  In cognitive testing, T.P.'s results showed he was in the average range (73rd percentile) for intellectual ability.  [R681].  His verbal reasoning skills also measured in the average range, while his nonverbal reasoning measured in the above average range.  [R681-82].  T.P.'s spatial abilities measured within the average range.  [R682].  He measured in the low range of functioning for adaptive behavior skills.  [R682-83].  The examiner noted that T.P. made minimal eye contact, participated in conversations but did not follow up with statements or questions to maintain the conversational flow, and spoke in full sentences.  [R683-84].  The examiner noted that T.P.'s imaginative play was limited and that he demonstrated repetitive behaviors, including hand flapping and posturing, and often became fixated on interests.  [R684-85].  T.P. was ultimately diagnosed with autism spectrum disorder and his prior diagnosis of ADHD was confirmed. [R684-85].  Behavior therapy, private speech therapy, and occupational therapy were recommended.  [R685-86].

In August 2016, Dr. Taiwo noted that Plaintiff reported being concerned about T.P.'s emotional and behavioral functioning and noted that T.P. was easily frustrated and angered when he did not get his way.  [R732].  On examination, T.P. was minimally communicative and his concentration and attention were rated as poor.  [R733].  Dr. Taiwo increased T.P.'s dose of Risperdal.  [R734].  In December

2016, Dr. Taiwo noted that T.P. was making progress in his overall treatment, condition, and functioning, but still noted that T.P. was difficult to engage in conversation and was not able to follow through on instructions or listen. [R726].

In January 2017, Plaintiff reported to Dr. Taiwo that T.P.'s behavior and condition had improved since his last visit and that his medication regimen was effective in controlling his behavior. [R722]. Dr. Taiwo noted that T.P. was less disruptive and that there had been improvement in his communication skills. [R722]. His speech was still not well articulated, and he presented as impulsive, active, not attentive, and easily distracted. [R722]. Dr. Taiwo also noted fair eye contact and improvement with reciprocating interactions. [R739]. In March 2017, Dr. Taiwo noted that Plaintiff was no longer satisfied with T.P.'s medication regimen. [R712]. On examination, Dr. Taiwo noted that T.P.'s cognitive function had improved, although he was unfocused and impulsive, and that his speech and language skills were not appropriate. [R712]. Plaintiff reported that T.P.'s aggression, hyperactivity, and distractibility at school had increased. [R712]. T.P. was prescribed Guanfacine[9] and Risperdal. [R713].

---

[9]     Guanfacine is a blood-pressure management medication that is sometimes used to treat ADHD by affecting the part of the brain that controls attention and impulsivity. Guanfacine, *Medline Plus*, https://medlineplus.gov/druginfo/meds/a601059.html (last visited Mar. 12, 2022).

In May 2017, Dr. Helen Panarites at TMAC took over T.P.'s psychiatric care, and her treatment notes from May 2017 to February 2019 largely mirror Dr. Taiwo's assessments, with Dr. Panarites noting that T.P. had poor speech articulation, short attention span and difficulty focusing, and behavioral disturbances. [*See* R776-849, 892-905, 912-948]. She also noted that he spoke in full sentences and was consistently able to name objects. [R791, 809, 823, 839, 846, 896]. She adjusted his medication, first tapering him off Risperdal before prescribing Vyvanse,[10] in addition to Guanfacine. [R778, 792]. A few months later, his Vyvanse dose was increased twice before it was stopped due to heightened emotionality. [R824, 840, 892]. Dr. Panarites then prescribed T.P. Concerta[11] in addition to Guanfacine. [R892]. However, about Concerta was eventually also stopped due to heightened emotionality. [R901-02]. He was then started on Focalin.[12] [R905, 912-13].

---

[10]    Vyvanse is a brand name for lisdexamfetamine, which is a medication used to control the symptoms of ADHD. Lisdexamfetamine, *Medline Plus*, https://medlineplus.gov/druginfo/meds/a607047.html (last visited Mar. 12, 2022).

[11]    Concerta is a brand name for methylphenidate, which is a medication used to treat ADHD. Methylphenidate, *Medline Plus*, https://medlineplus.gov/druginfo/meds/a682188.html (last visited Mar. 12, 2022).

[12]    Focalin is a brand name for dexmethylpenidate, which is a medication used to treat ADHD. Dexmethylphenidate, *Medline Plus*, https://medlineplus.gov/druginfo/meds/a603014.html (last visited Mar. 12, 2022).

In September 2018, Dr. Panarites completed a functional assessment form in support of T.P.'s social security claim.  [R880].  Dr. Panarites opined that T.P. had: a moderate impairment with regard to his cognitive and communicative development and function; no limitation with regard to his motor development and function; and a marked impairment with regard to his social and personal/behavioral development and function as well as his concentration, persistence, and pace.  [R880-81].  Dr. Panarites noted that T.P. had been sent home for being disruptive at school.   [R881].   In a separate checkbox functional assessment form completed that same month, she noted that T.P. had: marked impairments with acquiring and using information and caring for himself; extreme impairments with attending and completing tasks and interacting and relating with others; a moderate impairment with his health and physical well-being; and no impairment with moving about and manipulating objects.  [R872-74].

Beginning in November 2018, T.P. was admitted to TMAC's severe behavior clinic and was given psychotherapy by Dr. Mindy Scheithauer. [R898-900].   T.P. attended these therapy sessions weekly for six months. [R897-948].   He was noted to be able to play with toys and initiate social interactions and responded well to the behavioral strategies implemented by Dr. Scheithauer.  [R899, 917, 921, 924, 932, 937, 942, 947].

### 3.    Consultative and Non-Examining Evaluations

In November 2016, Stephen Hamby, Ph.D. conducted a consultative evaluation of T.P. [R700]. Plaintiff stated to Dr. Hamby that Risperdal helped T.P. focus and be calmer but that "he still has his moments." [R701]. Plaintiff further stated that T.P. could bathe and dress himself but did not want to do it, and that he could do certain chores, such as picking up his toys, but that it would cause a fight. [R702]. Plaintiff also stated that the family had two dogs and that T.P. got along well with them, and that he was generally doing better and being "friendlier," although he still had moments of aggression. [R702]. Dr. Hamby agreed with the diagnoses of ADHD and autism spectrum disorder, observing T.P. exhibit impulsive behavior and grabbing objects within his reach. [R703-04]. Dr. Hamby noted that T.P. had slightly slurred speech but that he was able to understand his speech with no difficulty. [R703]. Dr. Hamby calculated T.P. to have an IQ in the "superior range" and noted that he was somewhat difficult to control at times. [R705]. Dr. Hamby opined that T.P. had: a mild difficulty understanding and remembering instructions and new information; a good ability to communicate his needs; a mildly impaired ability to engage in age-appropriate social interactions; a mild to moderately impaired ability to exhibit adequate self-control; and a

25

moderately impaired ability to sustain his attention over time, in comparison to his same-aged peers. [R705].

In June 2017, state agency consultant William Gore, Ph.D. also conducted a consultative evaluation of T.P., noting that T.P. had: less than marked limitations in acquiring and using information, in interacting and relating with others, and with caring for himself; had a marked limitation in attending and completing tasks; and had no limitation in moving about and manipulating objects. [R136-38]. As to attending and completing tasks, on reconsideration, Dr. Gore noted that T.P. was more aggressive, more difficult to calm, and was very hyper. [R136-37]. Dr. Gore considered Ms. Manuel's assessment as well as Dr. Hamby's opinion in making his evaluation, giving Dr. Hamby's opinion some weight because it was partially consistent with the other medical record evidence. [R138].

## V.   ALJ'S FINDINGS

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant was . . . a preschooler on August 11, 2016, the date the application was filed, and is currently a school-age child (20 C.F.R. § 416.926a(g)(2)).

2.      The claimant has not engaged in substantial gainful activity since August 11, 2016, the application date (20 C.F.R. §§ 416.924(b) and 416.971 et seq.).

. . .

3.      The claimant has the following severe impairments: autism spectrum disorder (ASD), attention deficit hyperactivity disorder (ADHD), and a history of asthma (20 CFR 416.924(c)).

. . .

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.924, 416.925 and 416.926).

. . .

5.      The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 C.F.R. §§ 416.924(d) and 416.926a).

. . .

6.      The claimant has not been disabled, as defined in the Social Security Act, since August 11, 2016, the date the application was filed (20 C.F.R. § 416.924(a)).

[R39-53].

The ALJ first explained that T.P. did not meet or equal listings 112.10 or 112.11 because he did not have an extreme limitation in one or marked limitations in two areas of mental functioning, including: understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. [R40]. The ALJ noted that, during his July 2016 TMAC psychological evaluation, T.P. exhibited variable social interaction and attention but was able to follow one-step instructions and

27

answer direct questions.  [R40].  The ALJ also noted that T.P. needed motivation to continue with difficult tasks but scored in the average range of intellectual, verbal, nonverbal, and spatial abilities.  [R40].  Similarly, the ALJ noted, T.P. scored an average IQ during a consultative examination.  [R40].  The ALJ considered Plaintiff's testimony that T.P. was aggressive towards other children but noted that she told the consultative examiner that he got along with his siblings and the family dogs.  [R40].  The ALJ additionally relied on Plaintiff's statements to the consultative examiner that T.P. could bathe and dress himself, and could perform simple household chores, even if he did not always want to complete those tasks. [R40].  The ALJ further relied on Plaintiff's statements that T.P. enjoyed playing with his toy trucks and musical instruments and ultimately found, based on this evidence, that T.P. had only moderate limitations in mental functioning.  [R40].

Next, the ALJ conducted a functional equivalence assessment, stating that he had considered all of the relevant evidence in the record.  [R40].  The ALJ first considered Plaintiff's and T.P.'s grandmother's testimony at the hearing.  [R41]. The ALJ concluded that T.P.'s medically determinable impairments could reasonably be expected to produce the alleged symptoms but that their statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record.

[R42].  Citing the consistency factors in Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (S.S.A. 2016),[13] the ALJ reviewed the record evidence and concluded that the severity of T.P.'s functional limitations was less than alleged by Plaintiff and T.P.'s grandmother.  [R42].  The ALJ noted that, although T.P. had been under an IEP at school, his 2016 IEP showed that he required only instructional aids, small group instruction, and positive reinforcement, but did not require testing accommodations.  [R42].

Additionally, the ALJ noted that Plaintiff had not re-enrolled T.P. in speech therapy even though it was recommended by his psychiatrist and noted that, during his TMAC psychological evaluation, T.P. played with sensory toys, was content

---

[13]     **Error! Main Document Only.**Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

and active, exhibited variable attention and spoke in short sentences, followed one-step directions, and responded to his name. [R42]. The ALJ also pointed out that, during a second evaluation with TMAC, T.P.'s speech was sometimes unintelligible, his eye contact was variable, and while he would answer the examiner's questions, he would not ask any questions. [R42]. The ALJ relied on the aforementioned intellectual testing performed during that evaluation, noting that T.P. was diagnosed with autism spectrum disorder and ADHD and was advised to undergo behavioral and speech therapy. [R42].

The ALJ then considered Dr. Hamby's opinion, noting that Dr. Hamby agreed with the autism spectrum disorder and ADHD diagnoses and pointing out that T.P. had an impaired attention span during the evaluation and grabbed any objects within his reach. [R43]. The ALJ also relied on Dr. Hamby's observation that although T.P. had slightly slurred speech, he was able to understand T.P. without difficulty. [R43]. The ALJ turned to August 2017 progress notes from TMAC that indicated his aggressiveness had improved some, but he was still constantly putting things in his mouth. [R43]. The ALJ noted that increases in T.P.'s Vyvanse dose in February and April 2018 continued to help his aggression as well as his ability to focus at school. [R43]. The ALJ observed that, in July 2018, T.P. was switched to Concerta and that Plaintiff's reports of continued

tiredness and irritability were counteracted by statements that she had been giving T.P. only half of his Concerta dose.  [R43].

Based on this evidence, the ALJ concluded that Plaintiff's and T.P.'s grandmother's subjective reports of T.P.'s impairments and behavioral problems were "out of proportion" with the record evidence, noting that T.P. had been able to follow instructions and exhibited no behavioral problems at therapy, with the ALJ noting that Plaintiff had not always been compliant with T.P.'s provider's recommendations.  [R43].  In support of that conclusion, the ALJ noted that T.P.'s teachers reported he was much calmer and more manageable while on his medication.  [R43].

The ALJ next turned to T.P.'s activities of daily living, which he found supported a finding of less than marked or no impairment in the functional domains. [R44].  The ALJ pointed to Plaintiff's statements that T.P. attended elementary school and that, although he had some behavioral issues there, he generally completed his coursework and very rarely had homework.  [R44].  The ALJ also considered Plaintiff's testimony that T.P. participated in multiple extracurricular activities and had hobbies, before turning to the opinion evidence of record.  [R44].

The ALJ gave some weight to the opinions of the state agency medical and psychological consultants due to the fact that the consultants examined the record

31

evidence and opined as to specific limitations. [R44]. Specifically, the ALJ found that the consultants' finding of less than marked limitations as to T.P.'s ability to relate to others and care for himself "adequately reconcile[d]" Plaintiff's testimony of T.P.'s aggression with her reports to Dr. Hamby that he generally got along with his siblings and the family's dogs. [R44]. The ALJ noted T.P.'s IEP requirements again before concluding that T.P. had less than marked limitations in acquiring and using information, while agreeing with the state agency consultant that T.P. had a less than marked limitation in his ability to attend and complete tasks. [R44]. The ALJ turned back to Dr. Hamby's opinion, giving it some weight, and noting that although he only examined T.P. once, his opinion considered T.P.'s average IQ score during testing in addition to his hyperactive and distractable behavior during the examination. [R45]. Ultimately, the ALJ relied on T.P.'s IEP's recommendation that he have small group instruction to conclude that he had a less than marked impairment in social interaction. [R45].

The ALJ then turned to T.P.'s teachers' questionnaires, giving only some weight to Ms. Manuel's June 2017 assessment. [R45]. The ALJ explained that Ms. Manuel's statement that T.P. was easily distracted during arts and crafts was consistent with Dr. Hamby's reports that he was easily distractable, as well as his expressed variable attention during the TMAC psychological evaluation, but noted

that her opinion was given before successful changes in T.P.'s medication regimen. [R45]. The ALJ noted Ms. Garner's conclusions from her December 2018 assessment, paying particular attention to her statements that T.P. behaved more calmly when on medication and that, although she was a familiar listener, she could understand almost all of T.P.'s speech after repetition and/or rephrasing. [R45]. The ALJ also pointed to Mr. Bastarache's December 2018 assessment, noting his findings that T.P. had a slight to obvious problem with acquiring and using information and attending and completing tasks, and an obvious to very serious problem with social interaction. [R46]. The ALJ relied on Mr. Bastarache's comments that: he had difficulty understanding T.P. when discussing an unfamiliar topic but could understand almost all of his speech on a familiar topic; T.P. often became overstimulated during movement activities; and T.P. had serious difficulty managing his frustration with peers and responding appropriately. [R46]. The ALJ again emphasized Mr. Bastarache's comment that although T.P.'s behavior varied greatly, it was vastly improved when he was medicated. [R46].

The ALJ assigned great weight to Ms. Garner's and Mr. Bastarache's assessments since they observed T.P. daily for several months and their statements were generally consistent both with each other and with treatment notes documenting improvement in T.P.'s behavior after his medications were changed

and after application of positive reinforcement and behavioral strategies.  [R46].

The ALJ then considered Dr. Panarites's psychiatric opinion from September 2018,

giving her statements little weight because they were given "on checkbox forms

without extensive explanation of the limitations set forth," in addition to the fact

that her statements were largely based on Plaintiff's subjective reports. [R46].  The

ALJ also concluded that the limitations in Dr. Panarites's opinion did not correlate

with T.P.'s recent therapy notes indicating positive responses to positive

reinforcement and behavioral strategies.  [R46].

In his assessment of the six functional equivalence domains, the ALJ

determined first that T.P. had a less than marked limitation in acquiring and using

information, relying on Plaintiff's testimony, T.P.'s IEPs, the aforementioned

teacher questionnaires, and the TMAC psychological evaluation.    [R46-47].

Second, the ALJ concluded that T.P. had a less than marked limitation in attending

and completing tasks, relying again on the same three pieces of evidence.  [R49].

Third, the ALJ found that T.P. had a less than marked limitation in interacting and

relating with others, relying on Plaintiff's testimony and T.P.'s teachers' opinions.

[R50].  Fourth, the ALJ determined that T.P. had no limitation in moving about and

manipulating objects, relying on Plaintiff's testimony and his teachers' opinions.

[R51].  Fifth, the ALJ concluded that T.P. had a less than marked limitation in his

ability to care for himself, relying on Dr. Hamby's consultative examination and Plaintiff's statements to Dr. Hamby, T.P.'s teachers' assessments, and the recent therapy notes documenting progress after implementing behavioral strategies. [R52]. Finally, the ALJ found that T.P. had a less than marked limitation as to his health and physical well-being. [R53]. Accordingly, as the ALJ concluded that T.P. did not have an impairment or combination of impairments that resulted in either marked limitations in two domains or extreme limitations in one domain of functioning, the ALJ found that T.P. was not disabled. [R53].

## VI.   CLAIMS OF ERROR

Plaintiff raises five challenges to the ALJ's decision. [Doc. 35 at 1]. First, Plaintiff asserts that the ALJ failed to properly evaluate listings 112.10 and 112.11, arguing that T.P. had diagnoses supporting part A and at least marked limitations in concentrating, persisting, or maintaining pace, interacting with others, and adapting or managing oneself. [*Id.* at 25]. Plaintiff contends that the ALJ's one paragraph analysis on this issue was insufficient and that the ALJ erred by discussing and relying only Dr. Hamby's opinion, when the totality of the medical evidence supports a finding that T.P. meets the listings. [*Id.* at 25-27].

Second, Plaintiff argues that the ALJ erred in evaluating functional equivalence in the six domains. [*Id.* at 27]. Plaintiff asserts that the evidence

demonstrated that, compared to other children of the same age, T.P. has at least two marked and/or at least one extreme limitation in the six domains.  [*Id.* at 27-28]. Plaintiff also contends that the ALJ failed to fully consider the special education school records which supported marked limitations in the area of attending and completing tasks and extreme limitations in the areas of interacting and relating with others and adapting or managing himself.  [*Id.* at 27-39].  Plaintiff argues that the ALJ's conclusion that T.P. is not disabled was unsupported by substantial evidence and was reached based on a mischaracterization of the facts and a failure to consider the totality of the record evidence.  [*Id.* at 39-40 & 39 n.21].

Third, Plaintiff asserts that the ALJ's rejection of Dr. Panarites's opinion was not supported by substantial evidence, arguing that Dr. Panarites's opinion was consistent with the record as a whole and that she had a long-term treatment relationship with T.P. with his treatment, testing, and school records informing her opinion.  [*Id.* at 40-42].  Fourth, Plaintiff contends that the ALJ failed to properly apply the consistency factors in SSR 16-3p in evaluating the credibility of Plaintiff's testimony, T.P.'s grandmother's testimony, and the opinions of T.P.'s teachers and treating specialists.  [*Id.* at 42-43].  Specifically, Plaintiff argues that the ALJ gave an insufficient rationale for discrediting this evidence and contends that this evidence was consistent with the record as a whole.  [*Id.* at 44].

Fifth, and finally, Plaintiff asserts that new evidence presented to the Appeals Council—treatment records from the Georgia Autism Center dated July 25, 2019 to August 1, 2019—is relevant and probative to the issue of whether T.P. is disabled because it documents significant functional limitations, including two extreme and two marked limitations.  [*See id.* at 44-47].  Plaintiff argues that these treatment records also corroborate the credibility of the opinions of T.P.'s treating physicians, teachers, and family.  [*Id.* at 44].  Plaintiff contends that, contrary to the Appeals Council's determination, the treatment records were retrospective, related back to the period at issue, and were consistent with other treatment records and the statements of T.P.'s family and teachers.  [*Id.* at 48-49].

The Commissioner responds, first arguing that substantial evidence supports the ALJ's determination that T.P. did not meet the criteria for listings 112.10 and 112.11.  [Doc. 37 at 6-8].  The Commissioner contends that, contrary to Plaintiff's position, the ALJ clearly considered the psychological evaluation completed by TMAC and that the ALJ's reference of other evidence in his decision demonstrates that his findings were made after consideration of the entire record.  [*Id.* at 8-9].  Any event, the Commissioner asserts, the record evidence supports a conclusion that T.P. had less than marked limitations in regard to the paragraph B criteria for both listings.  [*Id.*].

Second, the Commissioner argues that the ALJ properly discussed and evaluated the functional equivalency factors after considering the medical opinions, school records, and other record evidence regarding T.P.'s activities and limitations. [*Id.* at 8-11]. The Commissioner asserts that the evidence discussed by the ALJ, which included test scores in addition to records of T.P.'s ability to function day-to-day, provided substantial support for his conclusion that T.P. did not have marked limitations in attending and completing tasks, interacting and relating with others, or caring for himself. [*Id.* at 11-20].

Third, the Commissioner argues that the ALJ's assessment of Dr. Panarites's opinion complied with the applicable regulations and was supported by substantial evidence, since the opinion was not well supported by explanations, it was largely based on Plaintiff's subjective reports, and it was largely inconsistent with Dr. Panarites's own treatment notes. [*Id.* at 22-26]. The Commissioner asserts that the ALJ identified and discussed evidence that was more than adequate to allow a reasonable person to agree with the weight he afforded Dr. Panarites's opinion. [*Id.* at 26]. Fourth, the Commissioner contends that substantial evidence supports the ALJ's evaluation of the subjective symptom reports of T.P.'s conditions as well as the ALJ's application of the factors in SSR 16-3p. [*Id.* at 27-31]. The Commissioner additionally argues that the ALJ provided sufficient reasoning after

38

considering the objective evidence to support his analysis of those factors. [*Id.* at 28-31]. Fifth, and finally, the Commissioner asserts that the new evidence submitted to the Appeals Council does not relate to the relevant period because it reflects assessments completed after the ALJ's June 2019 decision, reflects an intent to determine his then-current level of functioning, and does not indicate that the provider reviewed T.P.'s past medical records. [*Id.* at 32-34].

In reply, Plaintiff concedes that with regard to the first issue, the ALJ did cite evidence other than Dr. Hamby's opinion—namely, the TMAC psychological evaluation—but argues that the ALJ failed to consider the entire evaluation report and cherry-picked statements from it to support his desired outcome. [*See* Doc. 38 at 3-7]. Second, Plaintiff reiterates that the ALJ's functional equivalence analysis was not supported by substantial evidence. [*Id.* at 7-13]. Finally, Plaintiff reiterates her arguments as to issues three, four and five. [*Id.* at 13-14]. Plaintiff also filed a notice of supplemental authority, noting the Eleventh Circuit's recent decision in *Simon v. Comm'r, Soc. Sec. Admin.*, 1 F.4th 908 (11ᵗʰ Cir. 2021), *withdrawn on rehearing*, 7 F.4th 1094 (11ᵗʰ Cir. 2021).[14]

---

[14] Because the *Simon* decision Plaintiff references in her notice of supplemental authority was subsequently withdrawn by the Eleventh Circuit and Plaintiff has not filed any further notices, [*See* Dkt.], the Court presumes that Plaintiff has likewise withdrawn her reliance on that decision.

The undersigned has carefully considered the arguments, the ALJ's decision, and the entire record. Each challenge will be addressed in turn.

1.    *ALJ's Evaluation of the Listings*

In order for a claimant to prove that his impairment meets or equals a listing, he must have both a diagnosis included in the listings and medical records documenting the fact that the diagnosed condition meets all of the specific criteria of a listing. 20 C.F.R. § 404.1525(a)-(d); *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002). The ALJ is not required to address every piece of evidence so long as the decision sufficiently enables the Court to conclude that the Commissioner considered the claimant's medical condition as a whole. *Moncrief v. Astrue*, 300 Fed. Appx. 879, 881 (11th Cir. Dec. 1, 2008) (affirming the ALJ's decision despite the plaintiff's contention that the ALJ had ignored evidence favorable to her) (citing *Dyer*, 395 F.3d at 1211); *see also McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937-38 (11th Cir. Jan. 20, 2017) (same) (citing *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014)).

Listings 112.10 (autism spectrum disorder) and 112.11 (neurodevelopmental disorders) each have two paragraphs, and the alleged mental disorder must satisfy the requirements for both paragraphs. *See* 20 C.F.R. § 404, Subpt. P, App.1, §§ 112.10, 112.11. These paragraphs are known as paragraph A and paragraph B,

40

and to satisfy the paragraph B criteria, the mental disorder must result in an "extreme" limitation of one, or a "marked" limitation of two, of the four areas of mental functioning. *See id.* The four areas of functioning are: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* A marked limitation occurs when an impairment interferes seriously with a claimant's ability to independently initiate, sustain, or complete activities, and is a limitation that is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2). An extreme limitation occurs when an impairment interferes very seriously with the claimant's ability to independently initiate, sustain, or complete activities, and is a limitation that is "more than marked." 20 C.F.R. § 416.926a(e)(3).

The undersigned concludes that that substantial evidence supports the ALJ's evaluation of T.P.'s impairments under listings 112.10 and 112.11. As an initial matter, Plaintiff does not challenge the ALJ's evaluation of T.P.'s abilities under those listings in the area of understanding, remembering, and applying information, and neither party challenges the ALJ's apparent determination that T.P.'s diagnoses met the paragraph A criteria for both listings.

First, contrary to Plaintiff's position, the ALJ did not rely solely on Dr. Hamby's opinion and instead also referenced T.P.'s TMAC psychological evaluation, in addition to Plaintiff's testimony at the hearing and her statements to Dr. Hamby at the time of T.P.'s consultative evaluation.   [R40].   The ALJ concluded, based on this evidence, that T.P. had only moderate limitations in these areas of functioning, and the undersigned agrees that findings of marked limitations were not supported by the evidence.   [R40]; *see* 20 C.F.R. § 416.926a(e)(2).   As the ALJ noted, the record evidence showed that although T.P. demonstrated variable attention during the TMAC psychological evaluation, he also had the attention to follow one-step instructions and answer direct questions.   [R40; 680-82].   His cognitive testing both during that evaluation and during his consultative evaluation a few months later with Dr. Hamby showed that he had average intellectual, verbal, and spatial abilities, although he measured in the low range of functioning for adaptive behavior.   [R681-82; 705].   Plaintiff herself testified that T.P is "very smart," and that he enjoyed extracurricular activities such as football.   [R78-79, 82-83].   Additionally, although Plaintiff testified that T.P. tended to be aggressive towards other children, she also stated to Dr. Hamby that he got along well with his siblings for the most part as well as the family's dogs, and had been "friendlier" as of that time despite still having moments of aggression.

[R69-70, 79; 702].  Further, Plaintiff stated that T.P. was able to bathe and dress himself with some help, although he may not willingly do those activities, and was likewise capable of (though, again, not fond of) performing simple chores. [R90-92; 702].  This evidence was certainly "more than a scintilla" supporting the ALJ's determination that T.P.'s impairments did not interfere seriously with his ability to independently initiate, sustain, or complete activities, and he therefore did not have at least two marked limitations in the requisite areas of functioning.  *See Bloodsworth*, 703 F.3d at 1239; 20 C.F.R. § 416.926a(e)(2).

The undersigned notes that most of Plaintiff's argument as to this issue is devoted to pointing out the record evidence not mentioned by the ALJ that she believes supported a finding of at least marked limitations.  [*See* Doc. 35 at 25-27]. But that approach is misplaced because the Court is neither tasked with nor permitted to reweigh the evidence or to substitute its judgment for that of the ALJ. *See Dyer*, 395 F.3d at 1210.  Instead, where as in this case, substantial evidence supports the ALJ's determination that T.P.'s impairments in the areas of interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself did not result in at least two marked limitations, the ALJ's determination is conclusive.  *See, e.g.*, *Lewis*, 125 F.3d at 1439-40; *See* 20 C.F.R. § 404, Subpt. P, App.1, §§ 112.10, 112.11.

2.    *Functional Equivalence Evaluation*

In determining whether a claimant's functional limitations are marked or extreme, the ALJ considers all of the relevant information in the record, including information from "[the claimant's] parents, teachers, and other people who know [the claimant]."   20 C.F.R.  § 416.926a(e)(1)(i).   In addition, the ALJ should consider formal testing scores "together with the information [he has] about [the claimant's] functioning to determine whether" the claimant has a marked or extreme limitation in one of the functional domains.  *Id.*  § 416.926a(e)(1)(ii). Further, "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain."   *Id.* § 416.926a(e)(4)(i).

After careful review, the Court concludes that the ALJ's functional equivalency determination is likewise supported by substantial evidence.  The undersigned initially notes that Plaintiff challenges only the ALJ's assessment of T.P.'s functional abilities in the domains of attending and completing tasks, interacting and relating with others, and caring for himself.  [*See* Doc. 35 at 27-40] (presenting argument only as to these three domains).  Additionally, contrary to Plaintiff's apparent argument, the ALJ was not required to discuss every piece of evidence he considered and there is no basis for her contention that the ALJ failed

44

to consider the totality of the record evidence because he "summarized evidence that he found credible, useful, and consistent," although the Court notes that those would be appropriate reasons for relying on any piece of evidence.  [*See id.* at 40]; *See, e.g.*, *Moncrief*, 300 Fed. Appx. at 881 (affirming the ALJ's decision despite the plaintiff's contention that the ALJ had ignored evidence favorable to her) (citing *Dyer*, 395 F.3d at 1211).   In any event, the ALJ noted at the outset that he considered the entire record in making the functional equivalency determinations. [R40].

First, contrary to Plaintiff's apparent arguments, T.P.'s various test scores documented throughout the record are not in and of themselves a basis for concluding that the ALJ's functional equivalency determination is not supported by substantial evidence.  Instead, the pertinent regulations make clear that test scores should be considered together with all other information in the record.  *See* 20 C.F.R. § 416.926a(e)(1)(i).  In other words, the ALJ was not permitted to rely on test scores to the exclusion of all other evidence, since the regulations also clarify that no single piece of information, taken alone, can establish a marked or extreme limitation.  *See id.* § 416.926a(e)(4)(i).

Second, substantial evidence supports the ALJ's conclusion that T.P. did not have at least marked limitations in any of the three challenged functional domains.

45

As to attending and completing tasks, as Plaintiff points out, there was evidence in the record supporting delays in walking and speech, and T.P.'s IEPs included speech therapy.  [R69-70, 95,  234, 237, 389, 395-97, 249].  But records also showed that T.P. had average intelligence, verbal reasoning, and spatial abilities scores, passing grades in all subjects and a normal general development score, and his IEPs noted that he had academic skills in the average range.  [R233, 665, 681-82, 705].  T.P.'s teachers noted that he was able to complete work appropriate for his grade level, and Plaintiff testified that he almost always completed his coursework while at school.  [R81-82, 467].

In addition, although T.P.'s regular teachers felt that he generally had a slight to very serious problem with attending and completing tasks, they also explicitly stated that his behavior was much improved when he took his medication.  [R473, 477-82].  In fact, the record is replete with evidence that, more recently, T.P. was generally calmer and better able to concentrate when medicated, despite needing adjustments to his medication regimen.  [R701, 722, 735, 738-40].  Moreover, in a very thorough assessment, Dr. Hamby opined that T.P. would have only mild difficulty understanding and remembering instructions and new information, a good ability to communicate his needs, and a moderately impaired ability to sustain his attention over time, while the state agency consultant opined that T.P. had

marked limitations in attending and completing tasks.  [R136-38, 705].  In sum, although there certainly exists evidence in the record supporting Plaintiff's position that a greater limitation was warranted in this domain, there is likewise more than a scintilla of evidence supporting a less than marked limitation, as the ALJ found. *See Bloodsworth*, 703 F.2d at 1239.

As to interacting and relating with others, as aforementioned, there is abundant record evidence supporting the notion that T.P. was generally calmer and less aggressive towards others when medicated.  [R473, 477-82, 701, 722, 735, 738-40].  Much of the record evidence as to T.P.'s demeanor in this regard was based on Plaintiff's subjective reports, some of which were inconsistent.  As the ALJ noted, Plaintiff testified that T.P. was aggressive at home with his siblings but participated in team sports and reported to Dr. Hamby that he generally got along well with his family and had been "friendlier."  [R82-87, 702].  Additionally, while there is ample evidence that T.P. struggles with speech and articulation difficulties, there is also evidence that his speech is generally able to be understood, even if rephrasing is required, and that he spoke in full sentences with a well-developed vocabulary.  [R95, 100, 234, 354, 395, 471, 480, 683-84, 791, 809, 823, 839, 846, 896].  The Court concludes that this evidence constitutes substantial evidence supportive of the ALJ's determination that T.P. had less than marked limitations in

interacting and relating with others, particularly when he is medication compliant. *See Barron*, 924 F.2d at 230 (noting the ALJ's decision will not be overturned so long as it is supported by substantial evidence, even where there is substantial evidence to the contrary).

As to the caring for yourself domain, substantial evidence likewise supports the ALJ's determination that T.P. had a less than marked limitation.  Plaintiff both testified at the hearing and reported to Dr. Hamby that T.P. was capable of bathing and dressing himself, although he did not always voluntarily complete those tasks, and was capable of performing simple household chores.  [R90-92; 702]. Additionally, the evidence showed that T.P. was toilet trained and could feed himself.  [R233].  There was evidence that T.P. enjoyed playing sports, running around the house, watching TV, and playing games.  [R82-83, 92].  By far, as the ALJ noted, T.P.'s biggest hurdle in this domain was his ability to handle his emotions, but the evidence showed that his abilities in this area improved both with medication and with therapy.  [R473, 477-82, 701-02, 722, 735, 738-40, 897-948]. Again, while Plaintiff aptly points out evidence to the contrary, the Court is obliged to affirm where, as here, there is substantial evidence supporting the ALJ's determination.  *See Barron*, 924 F.2d at 230.

Finally, Plaintiff has devoted most of the argument section of her brief with regard to this issue to reciting facts that she feels supports her position that the ALJ's functional equivalency determination is not supported by substantial evidence, rather than presenting actual argument.  [*See* Doc. 35 at 28-38].  But as explained previously, the Court may not reweigh the evidence before the ALJ.  *See Dyer*, 395 F.3d at 1210.  Thus, as the ALJ's functional equivalency assessment is supported by substantial evidence, the ALJ's decision as to this issue is due to be affirmed.

### 3.   *ALJ's Evaluation of Dr. Panarites's Opinion*

Under the regulations applicable to Plaintiff's claim for benefits, the ALJ should assign controlling weight to the opinion of a treating physician unless he supplies a good reason for assigning the opinion less weight. 20 C.F.R. § 404.1527(c)(2).[15]  "Good cause exists when (1) the treating physician's opinion was not bolstered by the evidence, (2) the evidence supported a contrary finding, or (3) the treating physician's opinion was conclusory or inconsistent with his or her own medical records."  *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245,

---

[15]   Although 20 C.F.R. § 404.1527 has been superseded, it remains applicable to cases such as Plaintiff's that were filed prior to March 27, 2017. 20 C.F.R. § 404.1527 (2017).

49

1259 (11th Cir. 2019).  Failure to clearly articulate good cause for discounting the weight of a treating opinion constitutes reversible error, *see id*., but the Court will not second guess the weight assigned by an ALJ to a treating physician's opinion so long as he articulates a specific justification for it.  *Hunter v. Comm'r, Soc. Sec. Admin.*, 808 F.3d 818, 823 (11th Cir. 2015).

In determining the weight of medical opinions generally, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors which tend to support or contradict the medical opinion, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record.   20 C.F.R. § 404.1527(c)(1)-(6). Medical opinions about a claimant's abilities or limitations are relevant evidence but are not determinative because the ALJ has the sole responsibility for assessing the claimant's RFC.  20 C.F.R. §§ 404.1527(d).

The Court concludes that the ALJ's decision to give little weight to Dr. Panarites's functional assessment opinions was supported by substantial evidence.  It is undisputed that Dr. Panarites was a treating physician and the ALJ was therefore required to supply good cause before discounting her opinion.  *See*

20 C.F.R. § 404.1527(c)(2).   Here, the ALJ did so, noting that Dr. Panarites's opinions were both not supported by the record evidence and inconsistent with her own treatment records.   [R46]; *Schink*, 935 F.3d at 1259.   And that assessment was correct.   As the ALJ noted, one of Dr. Panarites's functional assessments consisted of a checkbox form unsupported by any explanations for the severe limitations she found, which would not be determinative even if supportive.   [*See* R872-74]; 20 C.F.R. §§ 404.1527(d).   The other assessment also consisted of a checkbox form but included two sections where Dr. Panarites filled in T.P.'s clinical diagnoses and symptoms, although these explanations were not linked to the limitations she checked off.   [*See* R876-78].   The two-year length of the treatment relationship notwithstanding, Dr. Panarites's assessments were inconsistent with her own treatment notes reflecting improvements in his aggression, mood, and overall behavior.   [R776-77, 808-09, 823, 845, 895]; 20 C.F.R. § 404.1527(c)(2), (4).   As the ALJ provided a sufficient justification for discounting Dr. Panarites's opinions, the Court will not second-guess the ALJ's determination.   *See Hunter*, 808 F.3d at 823.   Accordingly, the ALJ's decision is due to be affirmed as to this issue.

### 4. *Application of the Consistency Factors in SSR 16-3p*

In reviewing a claim for disability benefits predicated on pain and subjective symptoms, an ALJ must consider all of the claimant's statements about his

symptoms, such as pain, and any description of the same provided by medical or nonmedical sources, including descriptions of how the symptoms affect the claimant's activities of daily living and ability to work.  20 C.F.R. § 416.929(a). Nonetheless,

> [t]here must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment which would reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence . . . would lead to a conclusion that [the claimant] is disabled.

*Id.*; *see also* SSR 16-3p at *3 (noting that the ALJ must evaluate the intensity and persistence of the alleged symptoms to determine the extent to which they limit a child's ability to function independently, appropriately, and effectively for his age). In making this assessment, the ALJ must clearly articulate "specific reasons for the weight given to the individual's symptoms . . . consistent with and supported by the evidence." SSR 16-3p at *10.  Indeed, "inconsistencies in the objective medical evidence [are] one of the many factors" for an ALJ to consider.  SSR 16-3p at *5. Additionally, ALJs are permitted to consider other information about a claimant's symptoms, including any treatments or aggravating factors.   20 C.F.R. § 416.929(c)(3).

While somewhat unclear, it appears that Plaintiff is challenging the ALJ's decision to discount the subjective symptom reports and testimony of Plaintiff,

T.P.'s grandmother, his teachers, and unidentified "treating specialists" as inconsistent with the objective medical evidence. [*See* Doc. 35 at 44]. The Court concludes that the ALJ's evaluation of this evidence was supported by substantial evidence.

First, the ALJ discharged all of his duties under the pertinent regulations and SSR 16-3p. Specifically, the ALJ was required to compare the statements about T.P.'s subjective symptoms with statements of the same provided by both medical and non-medical sources, and to analyze whether those statements were supported by the objective medical evidence of record. *See* 20 C.F.R. § 416.929(a); *see also* SSR 16-3p. In making that comparison, the ALJ was required to clearly articulate specific reasons for the weight given to individual symptom reports, supported by record evidence, and the ALJ here did so. *See* SSR 16-3p at *10. The ALJ thoroughly explained why he concluded that Plaintiff's and T.P.'s grandmother's statements about T.P.'s symptoms overstated the severity of the impact of his impairments on his overall functioning, pointing to record evidence. [*See* R42-43].

In particular, the ALJ pointed to evidence that T.P.'s overall behavior generally improved while on medication, his IEPs required only instructional aids, small group instruction, and positive reinforcement, and that T.P. was able to follow one-step directions, in addition to evidence that he enjoyed playing football

and with toys.  [*See* R43]; *see also* 20 C.F.R. § 416.929(c)(3) (noting that ALJs are permitted to consider a treatment's effect on a claimant's symptoms).  The ALJ also noted that T.P.'s TMAC psychological evaluation and later consultative evaluation with Dr. Hamby were largely consistent with each other and inconsistent with Plaintiff's and T.P.'s grandmother's reports of his behavior, pointing to evidence from both evaluations that T.P. was able to speak in short sentences, answer direct questions, and complete more difficult tasks with motivation, and that he scored in the average ranges for intellectual abilities.  [R42-43].

Turning to T.P.'s activities of daily living, the ALJ pointed to objective evidence that T.P. had hobbies he enjoyed, generally got along well with his siblings, and generally completed his coursework at school without issue as inconsistent with Plaintiff's and T.P.'s grandmother's statements about the severity of T.P.'s impairments.  [R43-44].  This evidence constituted substantial evidence that, when considered in combination with Plaintiff's and T.P.'s grandmothers subjective symptom reports, supported the ALJ's ultimate conclusion that T.P.'s impairments were not disabling.  *See* 20 C.F.R. § 416.929(a).

To the extent Plaintiff argues that the ALJ did not offer an appropriate rationale for discrediting unspecified "treating specialists" whose opinions were consistent with the record evidence, the undersigned concludes that the ALJ did so

for the reasons explained above, and fully complied with his obligations under 20 C.F.R. § 416.929(a). Similarly, contrary to Plaintiff's contentions, the ALJ properly evaluated[16] and included T.P.'s teachers' assessments in his functional equivalence assessment, giving great weight to their statements that T.P.'s behavior greatly improved when he was medicated. [*See* R45-46]. Additionally, the Court is perplexed by Plaintiff's blanket assertion that the ALJ "failed to accept [the] reports" from T.P.'s teachers in making his functional equivalence determination, as the ALJ clearly explained that he assigned great weight to Ms. Garner's and Mr. Bastarache's statements and, in any event, the ALJ was not required to accept verbatim their opinions as to the six functional domains to the exclusion of all other evidence weighing on that determination. [*See* R48-49]. For these reasons, the ALJ's decision is due to be affirmed as to this issue.

    5.    *Appeals Council's Rejection of Post-Decision Evidence*

The Appeals Council will review additional evidence "that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of

---

[16]    For this conclusion, the undersigned refers to the portion of his prior discussion of Plaintiff's challenge to the ALJ's functional equivalence determination that involved T.P.'s teachers' assessments. *See* Issue 2, *supra*.

the decision."  20 C.F.R. § 416.1470(a)(5), (b); *see Hargress v. Comm'r of Soc. Sec.*, 883 F.3d 1302, 1309-10 (11th Cir. 2018) (noting that an assessment completed after the ALJ's decision was not chronologically relevant where the claimant was not treated during the relevant period and the physician did not indicate that past records were considered).  If the submitted evidence does not meet these requirements, the Appeals Council must send the claimant a notice explaining why the evidence was not accepted. *Id.* § 416.1470(c).

The undersigned concludes that the Appeals Council properly declined to consider the new evidence Plaintiff submitted because it was not chronologically relevant.  Specifically, the neurodevelopmental evaluation Plaintiff submitted was based on assessments completed between July 25, 2019, and August 1, 2019, after the ALJ's decision issued on June 3, 2019.  [R10, 53].  A review of the evaluation does not indicate that T.P. was previously treated or evaluated by the psychologist performing the evaluation, Jaymie Fox, during the relevant period, or that Dr. Fox's assessments were based on medical records created during the relevant period.  [*See* R10-24]; *Hargress*, 883 F.3d at 1309-10.  Instead, it appears that Dr. Fox received "historical" information about T.P. from an intake interview she conducted with Plaintiff at the start of her evaluation and reviewed only T.P.'s December 2018 IEP. [*See* R10-12].  The majority of Dr. Fox's evaluation, however, came from her own

observations of T.P. during their interactions as well as the testing she administered, which supports the stated goal of assessing T.P.'s "current level of functioning." [*See* R10, 12-20].   Thus, the Court finds that Dr. Fox's neuropsychological evaluation did not "relate to the period on or before the date of the hearing decision," and the Appeals Council properly declined to consider it.   *See* 20 C.F.R. § 416.1470(a)(5), (b).

## VII.   CONCLUSION

In conclusion, the Court **AFFIRMS** the final decision of the Commissioner. The Clerk is **DIRECTED** to enter final judgment in favor of the Commissioner.

**IT IS SO ORDERED and DIRECTED**, this 13th day of March, 2022.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE